# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

00 SEP 21  AM 9: 45

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **CLIFTON McGOWAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CV 99-BU-2971-E |
| | ) | |
| **INTERNATIONAL ENTERPRISES, INC. and EFW, INC.** | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

**ENTERED**

SEP 2 1 2000

## Memorandum Opinion

In this action, Plaintiff Clifton McGowan claims that his former employer, Defendant International Enterprises, Inc. ("IEI"), discriminated against him on the basis of race and terminated his employment in retaliation for having complained about such discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and 42 U.S.C. § 1981 ("section 1981"). Now before the Court is IEI's motion for summary judgment (Doc. No. 11). The parties have filed evidence and briefs on the motion, which is now ripe for decision. The Court concludes that IEI's motion for summary judgment is due to be GRANTED.

### I. BACKGROUND

Defendant IEI is a corporation that repairs, maintains, designs, and manufactures avionics equipment, primarily for the military. McGowan, a black male, was employed by IEI at its facility in Talladega, Alabama, from January 1991 until he was terminated on

22

August 9, 1999.[1]  Beginning in 1992, McGowan worked as a clerk in IEI's receiving department, and in 1993, he was named "receiving supervisor."  There is no dispute that McGowan was a very able employee.  In January 1998, IEI hired Bob McLeod, a white male, to manage its material control division, under whose mantle IEI placed its receiving, shipping, and supply departments.  McLeod thus became the immediate supervisor to McGowan, as well as to Roy Hollingsworth and Ed Baggett, the white males who headed the shipping and supply departments, respectively.

McGowan complains that IEI discriminated against him on the basis of race, in violation of Title VII and section 1981, by allegedly doing the following: (1) requiring him to perform shipping duties that he considered to be the responsibility of his white co-workers; (2) failing to comply with his requests to hire support staff for him in the receiving department until March 1998, while Hollingsworth and Baggett had clerks to assist them; (3) failing to treat him as the "supervisor" over Wayne Smith, the white receiving clerk who was hired in March 1998; and (4) "disciplining" him for talking with an employee on the clock before the beginning of his shift in December 1998, while treating white employees who committed that offense differently.

McGowan also claims that IEI violated Title VII and section 1981 by allegedly retaliating against him for voicing opposition to alleged race discrimination at IEI and for filing a charge of race discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 21, 1999.  McGowan charges that IEI retaliated against him in a variety of ways.  First, he asserts that Dan Murphy, the white male who was the director of IEI human resources department, placed several unfavorable memoranda in his personnel file immediately after he allegedly complained about race discrimination in

---

[1]In September 1999, after McGowan was terminated, IEI was sold to Defendant EFW, Inc.  See Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Brief") at 3.

December 1998, January 1999, and May 1999.  Second, he contends that after he filed his EEOC charge, Murphy "harassed" him while he was on extended medical leave in June 1999 by sending him threatening letters complaining that McGowan had not completed a required "request for leave" form before his absence.  Third, McGowan claims that Murphy suspended him July 22, 1999 for three days, after he refused to participate in the company's evaluation survey process, citing the pendency of his EEOC charge as the reason for his non-cooperation.  And fourth, McGowan claims that he was denied a requested transfer and fired on August 9, 1999 for retaliatory reasons.  In the instant motion, filed July 24, 2000, IEI argues that it is entitled to summary judgment on each of McGowan's claims alleging race discrimination and retaliation.

## II.  SUMMARY JUDGMENT STANDARDS

Summary judgment provides the parties an opportunity to test the mettle of a case before it ever reaches trial.  On a motion for summary judgment, the court assesses all of the proof the parties bring to bear in order to ascertain whether there is a genuine need for a trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)(quoting Advisory Committee Note to 1963 Amendment to Fed. R. Civ. P. 56(e)).  Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477

U.S. at 323, 106 S. Ct. at 2553; Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The moving party's burden is not meager; it must illuminate for the court the reasons why the nonmoving party cannot or does not raise a genuine issue of material fact sufficient to support a trial. Id. The moving party's burden was set forth in Clark as follows:

> The moving party bears the initial burden to show the district court, **by reference to materials on file**, that there are no genuine issues of material fact that should be decided at trial. **Only** when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. Celotex did not change the general rule. Celotex simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. **Even after Celotex it is never enough to simply state that the non-moving party cannot meet its burden at trial.**

Id. (citing Celotex, 477 U.S. at 323-25, 106 S. Ct. 2553-54)(emphasis added)[2]

Once the moving party has satisfied this initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S. Ct. at 2553

---

[2]The Eleventh Circuit recognized that Celotex created "an exception to the Adickes rule for [an] uncommon situation," i.e., "when neither party could prove either the affirmative or the negative of an essential element of the claim." Clark, 929 F.2d at 607, 608. In this "uncommon situation," the Celotex exception allows a moving party to carry its burden by showing or "pointing out," by reference to the record, that the non-moving party cannot prove its claim. Id. at 607. Obviously, this case does not fall into the "uncommon situation" addressed in Celotex.

(quoting Fed. R. Civ. P. 56(e)); see Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996); see also Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), cert. denied sub nom., 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995).

In resolving whether a given factual dispute requires submission to a jury, the district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmoving party's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996)(citing Hall v. Tallapoosa County, 50 f.3d 159, 1581 (11thCir. 1995)). The district court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. Anderson, 477 U.S. at 254-55, 106 S. Ct. at 513. However, the court must avoid weighing conflicting evidence for probity or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The court must avoid weighing conflicting evidence or making credibility determinations." Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" Tidwell v. Carter Products, 135 F.3d 1422, 1425 (11th Cir. 1998) (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)).

### III. CONTENTIONS & ANALYSIS

## A. Race Discrimination Claims

McGowan claims that IEI is liable for intentionally discriminating against him on the basis of race, in violation of both Title VII and section 1981. Both of these statutes prohibit race discrimination in employment, and both have the same requirements of proof and use the same analytical framework. Alexander v. Fulton County, Ga., 207 F.3d 1303, 1314 n.6 (11ᵗʰ Cir. 2000) (citing Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11ᵗʰ Cir. 1998). Thus, the Court discusses McGowan's Title VII and section 1981 race discrimination claims simultaneously.

McGowan does not allege that there is any direct evidence showing that he was subjected to race discrimination. Therefore, the Court's analysis proceeds under the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981), for use in discrimination cases involving circumstantial evidence. See Holifield v. Reno, 115 F.3d 1555, 1561 (11ᵗʰ Cir. 1997). Under such framework, the plaintiff "carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under [Title VII].' " Furnco Const. Corp. v. Waters, 438 U.S. 567, 576 (1978) (quoting Teamsters v. United States, 431 U.S. 324, 358 (1977)). Once the plaintiff has done so, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employment action in question. Burdine, 450 U.S. at 254. Finally, the ultimate burden of persuasion rests with the plaintiff who must show that the proffered legitimate reasons were merely a pretext for unlawful discrimination. See Reeves v. Sanderson Plumbing Products, Inc., ___ U.S. ___, 120 S.Ct. 2097 (2000).

### 1. Directed to Perform Tasks of White Co-Workers

McGowan first claims that he was subjected to racial discrimination in that

McLeod routinely ordered him to perform work that McGowan considered to be the responsibility of his white co-workers, or, more particularly, the employees in the shipping department. It is well established that making work assignments along the lines of race or sex is forbidden under Title VII. See Ferrill v. The Parker Group, Inc., 168 F.3d 468, 471-72 (11th Cir. 1999) (section 1981 violated by telephone marketer's practice of "race-matching" its employees to targeted survey respondents); Eubanks v. Pickens-Bond Const. Co., 635 F.2d 1341, 1345 (8th Cir. 1980) (affirming district court's finding of disparate treatment based on evidence that black cement finishers were assigned more undesirable tasks than similarly situated whites); Smith v. Texas Dep't of Water Resources, 799 F.2d 1026, 1030 (5th Cir. 1986) (female plaintiff made out a prima facie case of discrimination based on allegations that she, but not her male counterparts, was ordered to relieve her supervisor's secretary on a daily basis). Indeed, an employer may be found to violate Title VII even if the racially discriminatory assignment of jobs does not translate into economic loss. See Swint v. Pullman-Standard, 539 F.2d 77, 89-90 (5th Cir. 1976).[3]

However, the Court concludes that, even assuming that McGowan can make out a prima facie case on this particular claim, the evidence submitted establishes that he cannot show that the reasons offered by IEI are pretextual. The evidence shows that McGowan was, in fact, ordered to perform a number of tasks that could be more accurately characterized as related to "shipping," i.e., mailing out items, than "receiving," i.e., taking in mailed items. However, the evidence indicates that McLeod reasonably considered IEI's shipping and receiving operations, which were located in adjacent areas of the same building, to be opposite sides of the same package-processing coin, so to speak,

---

[3]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

and that he was authorized to instruct the receiving department, either McGowan specifically or both McGowan and Smith, to do some shipping-oriented tasks when time allowed. IEI also offered evidence, which McGowan does not dispute, that shipping items out in a timely fashion was a higher priority than was processing the incoming packages. In the face of this, McGowan offers only his assertions that the duties McLeod assigned him did not fall within what he considered to be his job description and that Hollingsworth was not too busy to perform the shipping tasks. However, an employer generally can assign its employees to perform the tasks it needs them to do. See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 588 (11th Cir. 2000) ("A university can assign its professors to teach the classes it needs them to teach."). Moreover, not everything that makes an employee unhappy is an employment action sufficient to support a claim under Title VII. See Doe v. Dekalb County School Dist., 145 F.3d 1441, 1449 (11th Cir. 1998). Nor does Title VII make actionable " 'the ordinary tribulations of the workplace.'" Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999)). There is nothing in the record indicating that McLeod did not believe that the shipping department was too busy to perform the tasks. Nor is there evidence undercutting McLeod's claim that he assigned these tasks based simply on his perception of the importance and given amounts of work in the shipping and receiving departments at a particular time. Indeed, despite McGowan's cries that he was overburdened with work, he admits that he always was able to complete his primary receiving tasks within the time expected, notwithstanding the shipping tasks he was delegated. He also admits that he worked overtime only occasionally, that he was never requested or required to do so, and that he worked overtime less often than either Hollingsworth or Wayne Smith, the clerk in McGowan's department. McGowan seems to question the fairness or wisdom of making him perform duties that could be categorized as belonging to the shipping department, but "[f]ederal

courts do not sit as a super-personnel department that reexamines an entity's business decisions." Mitchell v. USBI Co., 186 F.3d 1352, 1354 (11th Cir. 1999) (quoting Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991). The Court concludes that IEI is entitled to summary judgment on this discrimination claim.

### 2. Failure to Hire an Assistant in Receiving

Next, McGowan asserts that IEI subjected him to racial discrimination by failing to hire someone to assist him. IEI claims that McGowan cannot make out a prima facie case on this claim because, it argues, declining to hire support staff cannot ever be an employment action sufficiently substantial to support an action under Title VII or section 1981. The Court would hesitate to go that far, as it can image circumstances where the denial of support staff might be grounds for a discrimination claim. See, e.g., Malladi v. Brown, 987 F.Supp. 893 (M.D. Ala. 1997); Meckenberg v. New York City Off-Track Betting, 42 F.Supp.2d 359 (S.D. N.Y. 1999). Here, however, IEI did, in fact, hire Wayne Smith in March 1998 to assist McGowan in the receiving department. Although a number of months elapsed between the time McGowan began requesting an additional employee and the date Smith was actually hired, there is nothing in the record to undercut the assertion made by Nick Olivastri, the plant manager, that he did not reject McGowan's requests for help, but was, rather, "working on" obtaining another employee during that period. Moreover, although McGowan claims that he was required to process more packages per day working alone in receiving than was the entire shipping department, he was able, by his own account, to complete his duties in the receiving department within the time expected, and he does not dispute that Hollingsworth, the shipping supervisor, worked more overtime than he did. The Court concludes that even assuming McGowan can make a prima facie case, he cannot show pretext. Accordingly, summary judgment is warranted in favor of IEI on this claim.

### 3. Failure to Treat McGowan as a Supervisor

McGowan also complains that once Smith was hired in March 1998, IEI did not treat him, that is, McGowan, as Smith's supervisor. An employer's failure to allow its employee to perform all the supervisory duties contained in his job description because of the employee's race constitutes unlawful discrimination under Title VII. See Judie v. Hamilton, 872 F.2d 919, 921-22 (9th Cir. 1989). In order to make a prima facie case on this claim, McGowan must show that a similarly situated nonminority employee was afforded more favorable treatment. See, e.g., Holifield, 115 F.3d at 1562. Dan Murphy, IEI's human resources director, testified that the three supervisors in the material control division working under McLeod, i.e., McGowan, Hollingsworth, and Baggett, all were considered to have the same relationship to the clerks in their respective departments vis-a-vis supervisory authority. In essence, Murphy testified that these three individuals were all considered "supervisors" for purposes of doling out day-to-day assignments to their clerks, but not otherwise. McGowan does not deny that Smith reported to him to receive his day-to-day tasks. Indeed, Smith himself considered McGowan to be his immediate supervisor. Nonetheless, McGowan seems to complain that IEI did not consider him to be Smith's supervisor because he could not fire or discipline him for work rule violations or set his pay. However, he has failed to present substantial evidence indicating that he was ever specifically prohibited from supervising Smith or that Baggett or Hollingsworth had greater supervisory authority over their clerks. The Court concludes that McGowan has failed to make out a prima facie case of discrimination, and summary judgment will be granted on this claim.

### 4. Disparate Discipline for Talking to Employees on the Clock

In his fourth and final claim of race discrimination, McGowan asserts that he was subjected to disparate discipline. He claims that he was given a verbal warning and then a written reprimand based upon the fact that he was allegedly distracting an employee who was on the clock by speaking with her before the beginning of his shift on December

4, 1998. In order to make out a prima facie case on this claim, McGowan must be able to show, at a minimum, that he was subjected to an "adverse job action" and that his employer treated similarly situated employees outside his classification more favorably. See Spivey v. Beverly Enterprises, Inc., 196 F.3d 1309, 1314 (11th Cir. 1999); Holifield, 115 F.3d at 1562 (citing cases). The Supreme Court has suggested that employer liability will attach to discriminatory job actions that "constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). The Eleventh Circuit has also clarified that Title VII's protections extend to job actions that fall short of what have been termed "ultimate" employment decisions, such as discharge and failure to hire. See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1455-56 (11th Cir. 1998).[4] Thus, the Wideman Court held that the following actions directed at the plaintiff, at least when considered collectively, constituted discrimination prohibited under Title VII: (1) listing her as a "no-show" when she was scheduled to be off, and she was made to work without a lunch break when the error was brought to the attention of her manager; (2) giving her two allegedly undeserved written reprimands and a one-day suspension; (3) her manager's solicitation of negative comments about the plaintiff from her co-workers; (4) taking her off the schedule on a day she was supposed to work, and when she announced she was going to call corporate headquarters to find out why, her assistant manager threatened to shoot her in the head; and (5) when she suffered an allergic reaction at work, her assistant manager knowingly and needlessly delayed authorizing medical treatment. Id. However,

---

[4]The Court notes that Wideman actually involved consideration of the scope of adverse employment actions cognizable under Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), rather than the anti-discrimination provision, 42 U.S.C. § 2000e-2(a), which the Court now considers. However, there is no reason at all to think that the scope of employment decisions actionable under the anti-discrimination provision is narrower than under the anti-retaliation provision.

the <u>Wideman</u> Court also cautioned that "some level of substantiality . . . must be met for unlawful discrimination to be cognizable under [Title VII]." Thus, in <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1283-84 (11th Cir. 1999), the court held that a written memorandum expressing concern about the plaintiff's absences, warning of possible ramifications, along with justifiably classifying the plaintiff's absences as without leave, did not constitute adverse employment action under Title VII.

Here, McGowan contends that a verbal warning he received from McLeod on December 4, 1998, telling him not to come into the building prior to the beginning of his shift because he was distracting employees on the clock by talking with them, was an adverse action capable of supporting a discrimination claim. The Court disagrees. In itself, speaking with an employee and telling him not to violate a work rule simply does not impose any material job disadvantage. See <u>Graham</u>, <u>supra</u>. McGowan contends, however, that he also received a written reprimand for talking with the employee before his shift. The record confirms that a memorandum pertaining to the verbal counseling was placed in McGowan's personnel file. Further, Murphy admitted that he considered this memo to be a warning to McGowan. Even so, it seems questionable whether a written memorandum would be sufficiently material to constitute an adverse employment action. But more importantly, it is clear from examining the memo and Murphy's testimony that to the extent this memo actually was a reprimand, it concerned McLeod and Murphy's perception that McGowan responded to the verbal warning in an unduly irate and hostile manner, pounding on the table at which he and McLeod were sitting and complaining loudly and at length that IEI discriminated generally against its minority employees. Thus, it was not even ostensibly based on the fact that McGowan had spoken with an employee on the clock. Because this memo could be considered a disciplinary action made in response to McGowan's complaints, it might be an adverse employment action for purposes of his claim that he was subjected to retaliation for opposing an

unlawful employment practice. Indeed, McGowan argues as much, and that claim is discussed infra. However, the evidence clearly shows that the memo was not motivated by the fact that McGowan spoke with co-workers before the start of his shift. Nor does McGowan allege that any white employee who responded angrily to verbal warnings concerning workplace rules was treated differently than he was. Thus, the Court concludes that the memo does not constitute adverse employment action for purposes of McGowan's claim that he was subjected to disparate discipline on the basis of race. Summary judgment is due to be granted on this claim.

### B. Retaliation Claims

McGowan contends that IEI violated the anti-retaliation provisions of Title VII and section 1981. Under Title VII, an employee who engages in either of two kinds of activities is protected from retaliation by his employer based on those activities. Under Title VII's "opposition clause," an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e- 3 (a). And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Id. In this circuit, retaliation claims are also cognizable under section 1981. See Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405 (11ᵗʰ Cir. 1998).

McGowan argues that by voicing complaints of racial discrimination at IEI, he engaged in conduct protected under the opposition clause, and that the filing of his EEOC charge was protected under the participation clause. McGowan also claims that IEI took action against him for these protected activities, thereby violating Title VII and section 1981. In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title

VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000); Farley v. Nationwide Mut. Ins., 197 F.3d 1322, 1336 (11th Cir. 1999). Because McGowan pursues his Title VII and section 1981 retaliation claims as parallel causes of action, the Court will consider his Title VII retaliation claim with the understanding that such analysis applies with equal force to his section 1981 retaliation claim, as the Court did with his discrimination claims. See Standard v. A.B.E.L. Services. Inc., 161 F.3d 1318, 1330 (11th Cir.1998); Sullivan v. National R.R. Passenger Corp., 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and section 1981 with a single analysis).

### 1. Unfavorable Memos in December 1998, January 1999, May 1999

Plaintiff first claims that IEI took adverse employment action by placing unfavorable memoranda in his personnel file in December 1998, January 1999, and May 1999 because he voiced complaints of discrimination against minority employees. Here, the Court will assume that McGowan can establish a prima facie case. Nonetheless, the Court concludes that IEI is entitled to summary judgment on McGowan's retaliation claims because he cannot dispute the legitimate reasons offered by IEI for generating these memos.

IEI concedes that the memos in question are critical of McGowan, but it contends that they were generated not because of his often vague complaints of race discrimination but rather because of management's concerns regarding the openly hostile, disruptive, and insubordinate tone that McGowan took whenever he complained. IEI argues, correctly, that the hostile or disruptive manner in which an employee complains may render the employee's conduct unreasonable and thus unprotected for purposes of the opposition clause. See Rollins v. State of Florida Dep't of Law Enforcement, 868 F.2d 397, 400-01

(11th Cir. 1989). In order to determine the reasonableness of an employee's conduct, a court must, on a case-by-case basis, "balance the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment." Id., 868 F.2d at 401.

Here, McGowan concedes that in making complaints he was routinely and openly critical of his superiors' competence and at times questioned their authority to direct his assignments. Nor does he seriously dispute the material factual allegations contained in the memos, which specifically take him to task for the manner in which he was complaining. More particularly, McGowan admits that he became visibly angry, pounding on the table and complaining at length after McLeod told him not to arrive early for his shift because he was disrupting employees on the clock; that he stated on multiple occasions that he had "no personal respect" for and did not "like or care for" McLeod or Olivastri; that he stated that McLeod and Olivastri, whom he referred to as "those Canadians," did not deserve their positions; that he refused to shake McLeod's hand; that he told Murphy and Smith that McLeod was not properly trained in the shipping and receiving areas he managed; that he resisted performing requested tasks he perceived to be outside his job description, and that he indicated his refusal to train Smith in the step-by-step manner that he was directed to. Given this evidence, IEI has offered a legitimate reason for writing the unfavorable memos in question and has rebutted any presumption that it unlawfully retaliated against McGowan thereby.

Moreover, the Court concludes that McGowan cannot show pretext, because he has not offered substantial evidence undercutting IEI's explanation that it was motivated to write the memos by the repeated, disruptive, and insubordinate nature of McGowan's complaints. As stated above, McGowan does not dispute that he engaged in the conduct IEI alleges, and he does not assert that any employee who acted in a similar insubordinate

manner was treated more favorably. Summary judgment will be granted on this claim.

## 2. The "Harassing" Letter

McGowan also contends that IEI retaliated against him for filing his EEOC charge on May 21, 1999 by Murphy's sending to his home a "harassing" and "threatening" letter dated June 17, 1999. The record shows that McGowan went on extended medical leave on June 1, 1999, without first having advised his immediate supervisor, McLeod, that he would be doing so or completing a "request for leave" form. However, McGowan allegedly did so in reliance upon a statement made by Murphy that all he, Murphy, needed before McGowan took leave was the address to send his paycheck. Having submitted a form supplying that information, and having verbally advised Murphy that he was going to be having an operation and would be out for six to eight weeks, McGowan believed that such was all that had to be done.

Upon returning home after being discharged from the hospital on June 14, 1999, McGowan received a certified letter from Murphy that was postmarked with that same date. In the brief letter, Murphy stated that IEI had no record of McGowan providing a "request for leave form" and that, "[f]or scheduling purposes, it is important that we have an expected date of return from you." The letter concluded, "I hope that all went well with your surgery and we all wish you a speedy recovery. Please give me a call at your earliest convenience to let me know how you are doing."

Murphy and McGowan then wrote letters to each other that appear to have crossed in the mail. In Murphy's letter, dated June 17, 1999, about which McGowan complains here, Murphy wrote, in pertinent part:

> As of today, I have not received a call from you as requested in my earlier letter. Anita [Dempsey] informs me that you made a call to her and that she advised you to contact me as requested. I am concerned with your lack of cooperation and must now insist that you make contact with me regarding your expected date of return to work. . . . .
>
> Please contact me within 72 hours of receipt of this letter (three

> business days, not including weekends). Failure to make this contact, in
> light of the fact that you did not submit a 'Request for Leave' form, will
> result in your dismissal from employment . . . .

Having not yet received this correspondence, McGowan responded to Murphy's initial letter of June 14, by mailing to Murphy on June 18 a completed request for leave form and a statement from his physician listing his tentative date of return. In the accompanying letter, McGowan explained that he had not been aware of the necessity to complete a request for leave form since he had personally informed Murphy and two other employees that he was going to have surgery and would be out about six to eight weeks and had advised Murphy where to send his paycheck.

After receiving McGowan's request for leave form and the information on his expected return date, Murphy responded with a single paragraph letter, as follows:

> We are pleased to hear you are doing better. I'm sorry your stay in
> the hospital was extended, and we all hope your recovery goes well. Thank
> you for supplying the requested (request for leave) information. That is all
> that is required. I apologize if you misunderstood me with regard to your
> paycheck. At that time, I informed you that was all that we needed with
> regard to your pay, not in regard to your leave. Any way, with that said
> and the request for leave submitted, everything is covered and complete.

The Court seriously doubts that Murphy's letter of June 17th to McGowan could be considered an adverse employment action for purposes of supporting a retaliation claim. However, given that (1) McGowan admits that he did not telephone Murphy as requested in the prior letter and that (2) Murphy immediately sent an openly conciliatory letter apologizing for any misunderstanding after receiving the information he requested, there simply is nothing to suggest that Murphy's letter of June 17th was anything other than what it purported to be: a justifiable attempt to get needed information regarding the date of McGowan's anticipated return to work. Aside from the relatively short time period between the letter of June 17th and the filing of McGowan's EEOC charge, there is absolutely nothing to indicate any connection between the two. Summary judgment

will be granted on this claim.

### 3. The Suspension of July 22, 1999.

McGowan contends that Murphy suspended him for two days with pay on July 22, 1999, in retaliation for his complaints of discrimination and filing his EEOC charge. Murphy indicated in a contemporaneous memo that he did so for three reasons: (1) McGowan had initially refused to participate in the company's evaluation survey process, citing the pendency of his EEOC charge as an excuse; (2) Murphy perceived McGowan to have implied that he, Murphy, was a liar and had doctored McGowan's personnel file; and (3) McGowan had sent a letter to Murphy and other members of management, dated July 22, 1999, in which McGowan suggested that McLeod lacked knowledge regarding which department in material control should have been directed to ship certain items back to the coast guard.  Even assuming that McGowan can make a prima facie case, which is questionable as to the causation element, the Court concludes that summary judgment is warranted because McGowan cannot show pretext.  He admits that he initially refused to participate in the evaluation process, and he acknowledges that he mailed a letter to several members of management that openly criticized McLeod's competence. McGowan disputes that he implied that Murphy doctored his personnel file or that he was a liar.  However, he concedes that when Murphy provided him with a copy of the letter Murphy had sent to him on June 14, 1999, as McGowan requested, McGowan disputed that such was the letter sent to him because he did not recall the letter in question to have requested that he call Murphy with information concerning his anticipated date of return.  McGowan concedes that he was incorrect on that occasion in his assertion that it was not the letter sent to him.  But even if Murphy drew an inference from that episode that McGowan did not intend, there is nothing to suggest that Murphy did not honestly believe that McGowan had impugned him.  That Murphy might have been mistaken as to McGowan's intent is simply not evidence of pretext.  See <u>Walker v.</u>

NationsBank of Florida N.A., 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, J.,
concurring); Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Given
the conduct to which McGowan admits, and the fact that he offers no evidence tending
to indicate that other employees were treated differently for similar misconduct, summary
judgment is due to be granted on this claim.

### 4. Denial of Transfer and Termination

Finally, McGowan argues that IEI is liable for retaliation based on its denial of his
request for a transfer, which he requested on August 3, 1999, and based on its termination
of his employment. Murphy communicated both of these decisions to McGowan at the
same meeting on Monday, August 9, 1999. Murphy claims that he advised McGowan that
his requested transfer to another department would have involved a substantial cut in pay,
and that McGowan indicated his disapproval of such an arrangement. McGowan does not
deny that such occurred. Rather, he says that he simply assumed that he would be kept
at the same pay if he transferred, that Murphy informed him on the day of his
termination that such would not be the case, and that Murphy simply fired him rather
than allowing him to transfer. The Court agrees that the transfer "denial" and
termination decision were inextricably intertwined, given the circumstances here.

Murphy stated that he decided to fire McGowan based on the fact that McGowan
had taken unapproved leave at the end of his shift, from 4:30 to 5:00 p.m., on Thursday,
August 5, 1999, and for the entire following workday, Friday, August 6, 1999, in
conjunction with the fact that McGowan had received numerous warnings previously for
his alleged misconduct. It is undisputed that McGowan left work at about 4:30 p.m. on
August 5th without speaking to McLeod, but he had dropped off two "request for leave"
forms with a person in the supply department who said she would deliver them to
McLeod. McLeod ultimately received the forms that afternoon, but when he went to
look for McGowan he was already gone. McLeod then went and told Murphy that

McLeod had left on leave without first getting his approval and that he could not approve McGowan's leave requests because of a backlog in the receiving department and because he, McLeod, had just denied a verbal leave request of Baggett's for that same period.

McGowan does not deny that a backlog existed in the receiving department, and he cannot dispute that McLeod denied Baggett's leave request. McGowan suggests in his deposition that Hollingsworth was on leave at that time, but Hollingsworth's time cards show otherwise. McGowan also asserts that he and other employees were allowed to take leave without disciplinary action on other occasions without first getting supervisor approval. However, he has failed to show that there was a backlog of work in those other employees' departments at the time that leave was taken, so as to justify the denial of approval for such leave. Thus, McGowan has not sufficiently undercut the veracity of McLeod's offered justifications for denying McGowan's leave requests on this particular occasion. Moreover, while it was McLeod who made the decision to deny McGowan's requests for leave, the evidence shows it was Murphy alone who decided that McGowan's taking what was ultimately amounted to unauthorized leave in the fashion he did, along with his past warnings for misconduct, was grounds to terminate him. Thus, it is Murphy's termination decision that is at issue here. See Jones v. Bessemer Carraway Medical Center, 151 F.3d 1321, 1323 (11ᵗʰ Cir. 1998); Jones v. Gerwens, 874 F.2d 1534, 1541-42 (11ᵗʰ Cir. 1989). McGowan offers that he and other employees had previously taken leave without getting his supervisor's approval first. However, even if true, there is no evidence that those circumstances were similar to present here, where leave was ultimately and justifiably denied due to a backlog of work. Nor has McGowan shown that those employees had a similar disciplinary history to him, or that the importance of giving proper notice of intended leave had been explained to them, as occurred while McGowan was on sick leave in June 1999. Finally, even if other employees did take leave without first obtaining supervisor approval, there is no evidence that Murphy was aware

that such occurred and treated them more favorably. See <u>Gerwens</u>, <u>supra</u>. The Court concludes that McGowan cannot show that all of the reasons offered for his termination were pretextual. See <u>Combs v. Plantation Patterns, Inc.</u>, 106 F.3d 1519, 1543 (11th Cir. 1997). Accordingly, summary judgment will be granted on this claim.

IV.  CONCLUSION

Based on the foregoing, the Court finds that there is no genuine issue of material fact as to any of McGowan's claims and that IEI is entitled to judgment as a matter of law. Accordingly, IEI's motion for summary judgment (Doc. No. 11) is due to be granted, and this action will be dismissed with prejudice. A separate order will be entered.

DONE and ORDERED this **21st** day of September, 2000.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE